**P & D SALES & MFG. CO., a division of The Neff and Fry Company, Plaintiff,**

v.

**Billy B. WINTER and New Holland Machine Company, a division of Sperry Rand Corporation, Defendants.**

**Civ. A. No. 62 C 2044.**

United States District Court
N. D. Illinois, E. D.

Aug. 8, 1963.

Snow & Benno, Chicago, Ill., for plaintiffs.

Wolfe, Hubbard, Voit & Osann, John P. Bundock, Jr., Chicago, Ill., for defendants.

Mann, Brown & McWilliams, Chicago, Ill., for B. B. Winter.

IGOE, District Judge.

### FINDINGS OF FACT

1. This action is a suit for declaratory judgment pursuant to Title 28 U.S.C. § 2201, for invalidity, non-infringement and unenforceability of United States Patent No. 2,940,639, granted to Billy B. Winter on June 14, 1960 for a "Tubular Feeding Device".

2. The defendants answered and counterclaimed for infringement of Patent No. 2,940,639. The various issues raised by the pleadings were tried by the court.

3. The plaintiff is the P & D Sales & Mfg. Co., a division of The Neff and Fry Company, a corporation of the State of Ohio, and has offices and a place of business at Plainfield, Illinois, within this district, hereinafter called "P & D".

4. One of the defendants is Billy B. Winter, the named inventor in United States Patent No. 2,940,639, and a resident of Towanda, Illinois, hereinafter called "Winter".

5. The other of the defendants is the New Holland Machine Company, Inc., a division of Sperry Rand Corporation, a corporation of Delaware, and has a registered office and established place of business in this district, hereinafter called "New Holland".

6. The accused device made by P & D and Winter patent No. 2,940,639 in suit relate to livestock feeders of the type including a relatively long rotatable tube having an opening or openings therein which extend longitudinally of the tube. An auger is rotatably carried within the tube for carrying livestock feed through the tube. Livestock feed is delivered to one end of the tube by means of a hopper which forms a part of the feeder. It is generally intended that the tube be carried over some type of feed bunk or receptacle which is accessible to a relatively large number of animals. Various types of operating means and controls may be provided for the auger and the tube. Such feeders are initially operated by rotating the auger. Feed is then supplied to the hopper by various arrangements. The feed is generally distributed throughout the length of the tube by the rotating auger and the tube is caused to rotate to dump the feed into the feed bunk for consumption thereof by the livestock. Such feeders are generally sold in various lengths to accommodate any desired number of animals to provide for convenient feeding thereof without pushing or crowding of the animals.

7. Title to Patent No. 2,940,639 is in Winter, and New Holland is an exclusive licensee under that patent.

8. The accused device made and sold by P & D comprises a number of tube sections which are secured in an end-to-end relationship with the flanges of mating tube sections rotatably riding on rollers. The rollers are carried in frames which may be placed to stand in a feed bunk. One end of the rotatable tube arrangement abuts against a vertically disposed opening at the lower end of a hopper. The lower end of the hopper is rounded and an auger extends from within the lower rounded end of the hopper through the tube arrangement to the remote end of the tube arrangement. The hopper diverges upwardly from the lower rounded end and is further provided with a relatively short mixing auger disposed parallel to and immediately above the main auger. The shafts of both augers extend through one wall of the hopper and are rotatably driven by a motor. The hopper is usually filled from a feed delivery system which may comprise silos and other containers from which unloaders provide the desired feed mixture. Each tube section of the tube arrangement is provided with a plurality of rather large generally rectangularly shaped holes extending in a spaced apart relationship longitudinally of the tube sections. Each hole is longer than the spacing between a number of auger flights, and the spacing between adjacent holes is slightly greater than the pitch of the auger or the distance between two auger flights. The closed portions of the tube

between the holes are provided to keep the auger in the tube when the holes in the tube arrangement are disposed downwardly. The length of the spacing between the holes in the tube arrangement insures that at least one flight of the auger will be riding on the interior wall of each closed portion when the tube is overturned. Because of the arrangement of holes, any feed dropping from the tube in the overturned position is deposited in a series of spaced apart piles. The rotation of the tube arrangement is controlled by another motor which is carried at the near end of the tube arrangement. The remote end of the tube arrangement is provided with a pressure switch, commonly called a sail switch, which depends from the last roller carrying frame over the open remote end of the tube. The sail switch is connected to the tube motor and when sufficient feed reaches the remote end of the tube, the sail switch is swung outwardly by the feed and the tube motor is started to cause turning of the entire tube arrangement. The sail switch is provided with a roller which rides on the edge of the tube while the tube is rotating to hold the sail switch operated. When the tube is returned to the position with the holes disposed upwardly, the sail switch swings downwardly into a notch in the tube edge and the tube motor is stopped to stop the tube. In the operation of the feeder, the auger is started and stopped by a manual switch for the auger motor.

9. P & D acquired the accused device from the Moridge Mfg. Co., of Moundridge, Kansas.

10. The accused device was developed independently of any developments of Winter or New Holland.

11. The accused device originated in the design of a revolving dump tube feeder made by Mr. Fred Dudte, a farmer of Newton, Kansas. Mr. Dudte's feeder design was constructed for him by the Moridge Mfg. Co., and was placed into operation on Mr. Dudte's farm in the early part of the year 1959, where it was used by Mr. Dudte to feed between 100 and 200 beef cattle until the early part of the year 1963. Mr. Dudte's feeder comprised a tube which was approximately 60 feet in length. Feed was dumped from Mr. Dudte's feeder through a series of holes which were arranged in a spiral pattern extending longitudinally of the tube. Mr. Dudte's feeder was further provided with a hopper at one end of the tube and with an auger which extended longitudinally through the tube. In the operation of Mr. Dudte's feeder the auger and the tube were rotated at the same time but at different speeds. The Dudte tube was made up of five 12 foot sections secured in an end to end relationship and as feed was delivered to the hopper, the feed would travel through the tube with each of the five sections depositing feed at the same time as the tube rotated.

12. After the installation of the Dudte feeder, Moridge Mfg. Co. built a second feeder of substantially the same design as the Dudte feeder but about 100 feet longer. The second feeder was built for a Mr. Arthur R. Funk, a farmer of Hillsboro, Kansas, and was installed on Mr. Funk's farm in the fall of 1959. In the operation of the Funk feeder, many problems were encountered which were attributed to the substantially greater length of the Funk feeder as compared to the Dudte feeder. Considerable reworking and revision of the Funk feeder was undertaken by the Moridge Mfg. Co. until, in the first part of January of 1961, the revised and reworked Funk feeder was successfully operated. The successful revised Funk feeder was replaced in April of 1961 by a production model constructed by Moridge Mfg. Co. as a copy of the successfully revised and reworked Funk feeder.

13. One of the owners of the Moridge Mfg. Co., Mr. Elbert J. Guyer, corroborated the testimony of Messrs. Dudte and Funk and further testified as to his complete ignorance of any developments of Winter or New Holland on the subject matter of the Winter patent No. 2,940,639 until later notified by New Holland of the existence of the Winter patent No. 2,940,639. In the spring of 1961, a

sales agreement was consummated between Moridge Mfg. Co. and P & D under which agreement Moridge Mfg. Co. agreed to supply feeders to P & D for sale by P & D. The feeders built by Moridge for P & D were substantially identical in design to the final version of the successful Funk feeder. Beginning with the final version of the successful Funk feeder, Moridge Mfg. Co. made and P & D sold a total of 60 units after which Moridge ceased the manufacture of feeders because New Holland notified Moridge Mfg. Co. that in their opinion they were infringing the Winter patent 2,-940,639 and advised them to cease making those feeders. P & D then continued the manufacture thereof.

14. Mr. Guyer, in testifying about the Dudte feeder, corroborated Mr. Dudte as to the successful operation of the Dudte feeder. Mr. Guyer further brought out that Dr. Dudte intended to secure patent protection for his feeder until a patent search disclosed the Philipp patent No. 2,630,906 and patent counsel recommended no filing of an application on Mr. Dudte's feeder because the Philipp patent had covered almost the identical design.

15. After June 16, 1961, at which time an accused device was delivered to New Holland and prior to the institution of this suit and throughout the pleading period, the defendants continued to assert that they considered the accused device to infringe all claims of the Winter patent No. 2,940,639 and requested plaintiff to cease production and sale of the accused device. Just before the beginning of the trial, defendants modified their charge of infringement to claims 7, 9, 10, 11, 12, 14, 16, 17 and 18 of the Winter patent. Defendants, in their opening statement, said they would rely upon claims 11, 12 and 16 of the Winter patent, withdrawing claim 14 and reserving the right to rely upon the remaining claims 7, 9, 10, 17 and 18. Plaintiff relied upon three United States Letters Patent as anticipatory of the subject matter of the claims in issue. Those three patents were the Philipp patent No. 2,630,906,

the Virgil patent No. 2,646,023, and the Huggins patent No. 1,429,287. The Virgil patent had been cited by the Patent Office in the prosecution of Winter's patent application, but neither the Philipp nor the Huggins patents had been cited.

16. The non-cited Philipp patent is a pertinent prior art reference against Winter's defined invention. Philipp discloses a silage distributor or feeder which is made up of a number of tube sections which are secured in an end to end relationship. The junctions of the tube sections are rotatably carried on rollers which are supported by base members mounted in a manger or feed bunk. One end of the rotatable tube arrangement abuts against a vertically disposed opening at the lower end of a hopper. The lower end of the hopper is rounded and an auger extends from within the lower rounded end of the hopper through the tube arrangement to the remote end of the tube arrangement. The hopper diverges upwardly from the lower rounded end. The shaft of the auger extends through one wall of the hopper and is rotatably driven by a motor. Each tube section of the tube arrangement is provided with a feed distributing slot which extends longitudinally of the tube section. In addition to extending longitudinally of each tube section, each slot is further partially spiraled about each tube section. When any portion of the slot of each tube section is disposed directly downwardly, feed is distributed or dropped from the tube, and when any portion of the slot of each tube section is disposed other than downwardly, the auger will convey feed past or through that portion. The rotation of the tube arrangement is controlled from certain gearing connected from the tube arrangement to the motor which drives the auger, and that gearing is so sized that the tube is rotated considerably slower than the auger. Philipp's feeder is controlled by any conventional controls. The Philipp patent is more than a mere paper patent because the successful operation of the almost identical Dudte feeder over a period of years establishes the efficacy of

the Philipp patent as a pertinent reference.

17.  The Huggins patent is a pertinent reference against Winter's feeder. Huggins discloses a rotatably carried feed tube. One end of the tube abuts against a vertically disposed opening at one end of an upwardly curved stationary tube. The other end of the stationary tube opens into the lower end of a hopper. The curved stationary tube conveys feed from the hopper to the tube by means of gravity. A handle is secured to the tube for rotating the tube. A series of holes is formed through the tube and those holes are positioned in a spaced apart relationship to each other and extend along a straight line longitudinally of the tube. When the tube is rotated to discharge the feed from within the tube through the holes, the feed is discharged into a trough below the tube. Huggins, in his patent, recognizes the desirable result of feeding animals without crowding as he states in his description that the food will discharge equally fast through the holes in the tube and thus be uniformly distributed throughout the trough where it is accessible to all of the animals instead of discharging at one end of the trough and thus allowing some of the animals to get more than their share of the food.

18.  In regard to the prior art cited by the Patent Examiner in the examination of Winter's application, the cited Virgil patent is pertinent against Winter's device to show a feed responsive switch and conventional electrical feeder controls such as a timer, and as to the remaining cited prior art the Philipp and Huggins patents are more pertinent and should have been cited.

19.  A certified copy of the file wrapper and contents of the Winter patent No. 2,940,639, was introduced into evidence by the plaintiff and the testimony of one of plaintiff's witnesses, Mr. Paul O. Pippel, retired general patent counsel of the International Harvester Company, and a former examiner in the United States Patent Office, brought out that the file wrapper and contents of the Winter patent gave no indication that the patent examiner had considered the Philipp patent. Mr. Pippel, in referring to the file wrapper and contents of the Winter application, found that the examiner's notations as to his field of search did not include the class or subclass in which the Philipp patent is indicated as classified. Further, in being referred to a number of statements made by Winter's attorney and appearing in the file wrapper and contents of the Winter patent, in which statements Winter's attorney argued the insufficiency of the art cited, Mr. Pippel gave his uncontroverted opinion that those statements could not have been reasonably made by Winter's attorney if the Philipp and Huggins patents had been cited by the patent examiner. The evidence shows that the examiner in the patent office, in considering Winter's application, missed the Philipp and Huggins patents in his search.

20.  There is substantial identity of function, structure, operation and result between Winter's feeder and Philipp's silage distributor. Both devices are rotating tube feeders comprising a slotted tube arrangement with an auger extending therethrough. Both devices have a feed receiving hopper at one end of the tube arrangement and motor means for rotating the auger and tube as desired to cause feed from the hopper to be carried by the auger throughout the length of the tube and to cause the feed distributed through the tube to be dumped through the tube slot by appropriate rotation of the tube. The result of both devices is that the feed is deposited in a long substantially continuous pile for access thereto by each of a relatively large number of animals without excessive pushing or crowding of the animals to reach the feed. The foregoing description of Winter's device was corroborated by Mr. Winter on cross examination when he affirmed the truth of the statement appearing in the specification of his patent in column 5, lines 24 through 27, which states:

"The invention consists essentially of a hollow tube carrying an

auger which drives the feed into the tube and a mechanism for rotating the tube to discharge the feed into a container."

Although there was much testimony by defendants' witnesses to the effect that Winter's device was novel in that it provided for increasing or decreasing the frequency of feeding and the quantity of feed delivered each feeding, Mr. Winter, on cross examination, admitted that those features were somewhat uncertain and involved the will of the operator or herdsmanship rather than a definite feature of his feeder. He further admitted that his feeder did not require any particular controls or feed metering means.

21. Winter's feeder, though not identically disclosed in the Philipp, Huggins and Virgil patents, is so disclosed in those patents that the differences between the Winter device and the prior art devices are such that the Winter device as a whole, would have been obvious at the time Winter's invention was made to a person having ordinary skill in the art to which the Winter device pertains. Defendants' witnesses stressed that the new result achieved by the Winter device was the simultaneous dumping of feed over the entire length of Winter's tube upon the rotation thereof. Mr. Winter, on cross examination, admitted that the only advantage of such a result was the prevention of crowding of the livestock. Although the Philipp patent does not specifically refer to the problem of animal crowding, it does appear that Philipp's system of dumping from a series of partially spiraled slots could inherently dump feed almost simultaneously over the length of the tube arrangement, at least in sufficient time to prevent animal crowding. The difference in dumping time between the Winter and Philipp devices is merely a matter of degree. However, the Huggins patent does teach the identical result to Winter in simultaneously dumping feed the entire length of the tube to prevent animal crowding. It would not have involved invention at the time of Winter's conception of his feeder for a person skilled in that art to

have used the teachings of Huggins to provide Philipp's feeder with straight slots so that when Philipp's tube was overturned the feed would be simultaneously dumped the entire length of the tube arrangement. In such a construction, it would be of little consequence that Philipp's tube constantly rotates with the auger since the relative speed can be such that the auger will distribute feed longitudinally of the tube before the tube makes a complete revolution.

To the extent that the accused device is similar to Winter's device, the testimony taken by defendants of Messrs. Dudte and Funk, and that taken by plaintiff of Mr. Guyer, show that a device similar to Winter's was produced from a device almost identical to Philipp's by persons of varied but average skill. Although such development occurred about two to four years after Winter's filing, the difference in time is not so great as to avoid the conclusion that Philipp could have been modified at the time of Winter's invention to produce Winter's device by a person of average skill in that art without the exercise of inventive faculty.

22. Winter's device as explained by him on cross examination is not concerned with nor does it require any particular electrical control system. Mr. Winter testified that he had no knowledge of the electrical circuits of his patent. In view of Mr. Winter's testimony, the teachings of the Philipp and Virgil patents or the Philipp, Huggins and Virgil patents, are sufficient to anticipate Winter's device as an electrically controlled automatic feeding device in function, structure, operation and result.

23. Mr. Winter's testimony in total establishes that to the extent that any of the claims of his patent define more than a rotatable tube having a longitudinally extending opening with the tube carrying an auger, and having a hopper associated therewith, Mr. Winter is not the sole inventor of the invention defined in those claims.

24. The specification and drawings of the Winter patent are not in such full,

clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same. The specification and drawings of Winter are particularly deficient in the description of the pressure switch designated 49. Mr. Winter, on cross examination, described the pressure switch in many different ways, at one point even referring to it as a hole, none of which are to be found described or disclosed in the specification or drawings.

25. The claims in issue of the Winter patent do not particularly point out and distinctly claim the subject matter of the patent which Mr. Winter regards as his invention. A common failure of most of the claims in issue is the use of "means" clauses without proper antecedents.

26. There is substantial identity of structure, function, operation and result between the disclosure of the Philipp patent and Winter's device as defined in the claims in issue and as those claims may be reasonably interpreted in the light of Winter's disclosure in his patent and in his testimony.

27. As Winter's feeder is defined in the eight claims in issue, it is substantially anticipated by the prior art patents to Philipp and Huggins which were not cited and the Virgil patent which was cited by the examiner. The quality of invention is lacking. The prior art patents to Philipp, Huggins and Virgil teach generally the functional relationship defined in Winter's claims and it does not rise to the dignity of invention to teach further minor changes to achieve more desirable or effective results, there being involved in such process no discovery but only the exercise of prudence and skill.

28. New Holland, by agreement with Winter, exercised joint control with Winter over the prosecution of Winter's patent application before the Patent Office.

29. New Holland had direct knowledge of the Philipp patent through its consideration, study, purchase and ownership thereof before the issuance of the Winter patent.

30. New Holland did not bring the Philipp patent to the attention of the Patent Office before the issuance of the Winter patent.

31. New Holland knew or should have known that by failing to bring the Philipp patent to the attention of the Patent Office before the issuance of the Winter patent, Winter's application for patent would likely issue into a patent containing claims of a scope broader than Winter was entitled to receive.

32. New Holland's production and distribution of commercial machines pursuant to license under the Winter patent was started about October of 1962. The commercial machines sold by New Holland are substantially different from the Winter device in the lack of any feed responsive pressure switch; the tubes of the New Holland machines being dumped by a critically adjusted timer.

33. The accused device is more similar in many respects to the prior art than to Winter's device. The accused device has a tube terminating at the side of the hopper so that the hopper is always in open communication with the tube as in Philipp as opposed to the intermittent closing of Winter's hopper by his tube. The accused device has a plurality of end-to-end abutting tubular sections as in Philipp as opposed to Winter's single tubular section. The accused device has a plurality of spaced apart openings in a tube arranged in a straight line as in Huggins as opposed to Winter's substantially continuous slot. The accused device has no metering means between the hopper and the tube similarly to Philipp and as opposed to Winter's metering plates disposed between the hopper and the tube. The accused device has no timer similarly to Philipp and as opposed to Winter's timer. The accused device is provided with a feed responsive sail switch at the end of the tube as in Virgil as opposed to Winter's generally designated pressure switch. The accused device is carried on a floor engaging stand with rollers thereon supporting the junctures of the tubular sections from the underside as in Philipp as opposed to

Winter's device which is hung from the top. The accused device is primarily a silage distributor as is Philipp as opposed to Winter's non-fibrous feed distributor.

34. The accused device is not a taking of any invention of Winter because of the differences between the accused device and Winter's device as defined in the claims in issue when those claims are construed to include the limitations which are imposed thereupon by the prior art, the file wrapper and contents, and the admissions of Mr. Winter, the named inventor, at the trial.

35. Any finding of fact entered herein which may be properly construed in whole or in part as a conclusion of law shall be so deemed and treated as if set forth under Conclusions of Law herein.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and of the subject matter.

2. The Winter patent 2,940,639 is not entitled to the usual presumption of validity because of the failure of the Patent Office to consider the pertinent prior art references of Philipp 2,630,906 and Huggins 1,429,287.

3. The Winter patent 2,940,639 is invalid for failure to meet the requirements of Title 35 of the United States Code § 102, because the Winter Tubular Feeding Device does not involve invention over the prior art, and particularly the prior art patents to Philipp 2,630,906, Virgil 2,646,023 and Huggins 1,429,287.

4. The Winter patent 2,940,639 is invalid for failure to meet the requirements of Title 35 of the United States Code § 102(f), because Mr. Winter did not himself solely invent the subject matter of his patent.

5. The Winter patent 2,940,639 is invalid for failure to meet the requirements of Title 35 of the United States Code § 103, because the differences between the subject matter of Winter's patent and the prior art, particularly the patents to Philipp 2,630,906, Virgil 2,-646,023 and Huggins 1,429,287, and the suggested combinations thereof, are such that the subject matter of Winter's patent as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which such subject matter pertains.

6. The Winter patent 2,940,639 is invalid for failure to meet the requirements of Title 35 of the United States Code § 112, because the specification and drawings of the Winter patent are not in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and the claims in issue of the Winter patent do not particularly point out and distinctly claim the subject matter of the patent which Mr. Winter regards as his invention.

7. The accused device is not an infringement of the Winter patent 2,940,-639.

8. The equities are with the plaintiff and plaintiff should prevail because:

— The accused device was developed independently of any developments of Winter or New Holland;

— The accused device was commercially made and sold before any commercial sales of devices by Winter and New Holland;

— The accused device is more similar to the prior art than to Winter's device; and

— The defendants are guilty of inequitable conduct before the Patent Office.

9. Any conclusion of law entered herein which may be properly construed in whole or in part as a finding of fact shall be so deemed and treated as if set forth under Findings of Fact.

## JUDGMENT ORDER

At Chicago, Illinois, in said Division and District on August 8, 1963,

It is Ordered, Adjudged and Decreed that:

1. Plaintiff receive judgment on its complaint in accordance with the fore-

going Findings of Fact and Conclusions of Law.

2. The Winter patent 2,940,639 is declared invalid and void in law.

3. The accused device does not infringe any valid claim of the Winter patent 2,940,639.

4. Defendants' Counterclaim is dismissed with prejudice.

5. Plaintiff recover its costs, disbursements, and attorneys' fees in an amount to be settled at a further hearing.